IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JUDY RENELLE OGDEN,
      Plaintiff,

vs.                              Case No.: 5:12cv264/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 10, 11).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner will be affirmed.

I.      PROCEDURAL HISTORY

On July 12, 2007, Plaintiff filed an application for SSI, and she alleged therein disability beginning September 4, 1979 (tr. 23).[2]  Her application was denied initially and on reconsideration,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on December 17, 2012 (doc. 13).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

and thereafter she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on April 9, 2010, and on May 26, 2010, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 23–33). The Appeals Council subsequently denied Plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court. <u>Ingram v. Comm'r of Soc. Sec. Admin.</u>, 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.     FINDINGS OF THE ALJ

In denying Plaintiff's claim, the ALJ made the following relevant findings (*see* tr. 23–33):

(a)     Plaintiff did not engage in substantial gainful activity between July 12, 2007, the date she applied for SSI, and May 26, 2010, the date of the ALJ's decision[3];

(b)     Plaintiff had two severe impairments during the relevant period, namely, back pain and degenerative joint disease ("DJD") of the right knee, but she had no impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(c)     Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, as defined in 20 C.F.R. § 416.967(a),[4] with certain postural restrictions and limitations;

(d)     Plaintiff—who was born on October 21, 1964, and thus was under the age of fifty, a "younger person" (*see* 20 C.F.R. § 416.963(c)), during the relevant period—has a limited education and no past relevant work[5];

(e)     During the relevant period, Plaintiff was able to perform jobs existing in significant numbers in the national economy, which were performed at the sedentary level of exertion and otherwise accommodated her RFC, and thus she was not disabled.

---

[3] This time frame—July 12, 2007 through May 26, 2010—is the time frame relevant to Plaintiff's claim for SSI and will hereafter be referred to as the "relevant period." *See* <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which she is both disabled and has an SSI application on file).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

[5] Because Plaintiff has no past relevant work, transferability of job skills is not an issue.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).   "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).   Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.   The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).   Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).  Pursuant to 20 C.F.R. § 416.920(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, she is not disabled.

2.      If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.      If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.      Even if the claimant's impairments prevent her from performing her past relevant work (or a claimant has no past relevant work), if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 416.912. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

A.      Background

In 1979, at the age of fifteen, Plaintiff suffered a severe electrical burn that markedly deformed her right lower extremity (tr. 349, 363). Over the years she underwent multiple surgeries, including reconstructions of the patella and skin grafts, and she had multiple infections, which ultimately cleared (tr. 349).[6] Her last burn-related surgery was in (approximately) 2001 (see tr. 67).

---

[6] Many of the medical records in this case, including those related to the multiple surgeries, are dated well before the relevant period (see, e.g., tr. 262–302 (records dated between 1980 and 2004), tr. 323, 325–408 (records dated between 1996 and 1998, and records from 2000, 2002, 2003, and 2004)). Thus, the medical summary, infra, will primarily focus on treatment records from the relevant period, which relate to the issues raised in this appeal (i.e., approximately forty-three pages of records, concerning Plaintiff's knee, found at tr. 305–06 (duplicated at tr. 309–10), 307, 320–22 & 324 (duplicated at tr. 315–18), 436–42, 482–83, 489–90, 492–94, 496–97, 503, 511–520, 528–35, & 539).

Plaintiff has two children and has rarely, if ever, worked (*see* tr. 43, 55, 363). By 1997, she was divorced and reportedly depressed, in part due to the loss of her husband's income (tr. 305). At her hearing before the ALJ, held April 9, 2010, she testified that she lives with her mother on the second floor of an apartment building (tr. 41). She normally takes the elevator to their residence but uses the stairs once every three to four months (tr. 42). When she climbs the stairs she must do so "one step at a time" (*id.*). Plaintiff, who is her mother's caretaker, testified that she drives "a couple of times a week" to grocery shop, eat out, pick up her mother's medications, and perform other similar activities or errands (*see* tr. 45–46, 52).[7] She also drove to her hearing before the ALJ, and she noted that she traveled to Orlando, Florida (presumably from Panama City, Florida) by car approximately eighteen months prior to her hearing (tr. 46).[8] Plaintiff can dress, bathe, shower, apply makeup, put on shoes, and brush her teeth without assistance (tr. 48). She is also able to rinse dishes, put them in the dishwasher, and empty the dishwasher; dust and do light cleaning, such as wiping counters; do laundry; prepare microwave meals; take her mother's walker to her; and push her mother's wheelchair to her (tr. 49–51). Plaintiff testified that she can perform household chores for approximately fifteen minutes, after which she must take an hour-long break, but she cannot bend or lift (*see* tr. 49, 66). She also noted that in the summer she swims twice a week, for about thirty minutes, and she goes to the beach once a month to sit for about thirty minutes and enjoy the view (tr. 51–52), although she cannot walk through the sand (tr. 58).

On an average day, Plaintiff sits approximately 75–80% of the day, and has her right leg elevated the entire time she sits (tr. 59).[9] She estimated that, due to pain in the right knee, she can stand for only fifteen minutes and has a "minimal" ability to walk (*see* tr. 55–56). Additionally, even though Plaintiff apparently elevates her leg the entire time she sits, she testified she can sit for

---

[7] Plaintiff testified that her father died four years prior to her hearing (or, in or about 2006), and she began caring for her mother after his death (tr. 49).

[8] Plaintiff testified that her sister drove to Orlando and that they "stop[ed] a lot" because her sister has a bad back (tr. 46).

[9] In August 2008 Plaintiff completed a disability report and suggested that she did not sit most of the day (*see* tr. 239–46). For example, in pertinent part, she reported that on a typical day (in August 2008) day she got up, made her bed, took a bath, swam in a pool, visited with her children, and grocery shopped (tr. 239).

approximately forty-five minutes before she has to elevate her right leg (*see* tr. 55).[10]  Plaintiff explained that the pain in her knee "escalates into [her] nerves" and goes up from the knee to the right hip and down from the knee to the right foot, and that when the pain escalates she must elevate her leg (tr. 56).  She rated the pain "she feel[s] most of the time" at a seven on a ten-point scale (tr. 57).  Plaintiff noted she takes Lortab for pain and typically does so twice per day (tr. 60), and she stated she has no side effects from her medication (tr. 62).  She also confirmed that during the relevant period, she had not been prescribed a wheelchair, crutches, cane, or walker (tr. 64).

B.      Relevant Medical History

On October 12, 2007, three months after the relevant period began, Plaintiff presented to Southern Orthopedic Specialists, P.A. ("Southern Orthopedics"), with complaints of "an abrupt onset of pain, swelling and warmth about the medial [right] knee" and reduced range of motion ("ROM") in the knee (tr. 322).[11]  Orthopedist Cory R. Gaiser, D.O., referred Plaintiff for magnetic resonance imaging ("MRI") of the knee (tr. 322, 324).  The MRI, obtained October 12, 2007, revealed severe degenerative arthritic changes, particularly involving the medial compartment; a small, irregular medial meniscus; degenerative changes in the lateral meniscus; and chondromalacia patella (tr. 324).

On October 15, 2007, Kamal H. Zawahry, M.D., a pulmonologist and internist, conducted a consultative examination of Plaintiff at the Commissioner's request (*see* tr. 305).  Dr. Zawahry noted an "extensive deformity of the right knee" (tr. 306).  He also conducted ROM testing and noted reduced ROM in the right knee, with flexion and extension, and in the right ankle (tr. 307).  Dr. Zawahry diagnosed "extensive muscle loss with right leg weakness and probable chronic traumatic arthritis of the right knee as a result of [an] electrical burn injury [in 1979]" (*id.*).  Additionally, he opined that Plaintiff was incapable of performing any type of work activity, "even sitting as a receptionist," because "her leg needs to be extended while she is sitting, which will interfere with her doing a proper job" (tr. 306).

---

[10] The ALJ noted that Plaintiff had been sitting for approximately forty-five minutes during her hearing, and when he pointed this out to Plaintiff she stated she was "okay," but she was starting to get sore, and that if she elevated her leg at that point it would reduce her pain (although she declined to do so after the ALJ indicated to her that she could) (*see* tr. 60).

[11] The treatment notes also indicate that Plaintiff was there for a "recheck [of the] right knee," that she was a former patient of Southern Orthopedics, and that she was last seen there in 2004 (*see* tr. 322).

The day after the consultative examination Plaintiff began treatment with Dr. Zawahry, primarily for pulmonary issues such as asthma (*see, e.g.*, tr. 440–49). She also complained of chronic fatigue and back pain (*see* tr. 441–42). Dr. Zawahry examined Plaintiff at her first visit (October 16, 2007), this time in connection with his treatment of her and not at the Commissioner's request (*id.*). The examination revealed full ROM in all extremities, no swelling of any joint, equal and normal deep tendon reflexes, intact sensation, "satisfactory" motor skills, and a gait "within normal limits" (*id.*). Dr. Zawahry assessed bronchial asthma, history of back injury, and chronic fatigue syndrome; prescribed Lortab (sixty 10mg tablets), to be taken once every six hours (if needed) for pain; and advised Plaintiff to return in one month (*see* tr. 442).

Plaintiff returned to Southern Orthopedics on October 17, 2007 (tr. 322). The examining physician, whose name is not apparent from the treatment record, noted swelling in the medial knee, assessed "infected right knee," and prescribed antibiotic medications (*id.*). Plaintiff returned five days later and reported less soreness (*id.*). She was then assessed with "cellulitis right knee improving" (tr. 321). Her medications were continued, and she was advised to return shortly for follow up (*id.*). Plaintiff returned on November 7, 2007, and stated she was "better until yesterday when her pain increased anteromedially" (*id.*). The examining physician noted redness and swelling in the right knee, but intact extension, and assessed the same condition (cellulitis), continued Plaintiff's medications, and advised her to return in two weeks (*id.*). Plaintiff returned for a "recheck of [her] right knee" on December 5, 2007, and reported that she was "somewhat better" (tr. 320). An examination of the knee revealed a working extensor mechanism, mild swelling, and no redness, and the physician opined that Plaintiff "would continue" to improve and should return on an "as needed" basis (*see id.*).

Plaintiff returned to Dr. Zawahry on November 15 and December 6, 2007 (tr. 440). The treatment notes make no mention of Plaintiff's knee condition and primarily concern her asthma (*see id.*). Similarly, in January, February, March, and April of 2008, Dr. Zawahry treated Plaintiff for complaints of shortness of breath, a cough, and back pain—but not knee pain—and he diagnosed chronic back pain syndrome, chronic fatigue, bronchial asthma, and/or acute bronchitis—but not any knee-related impairment (tr. 438–39). He also renewed Plaintiff's Lortab prescription (*id.*). At visits with Dr. Zawahry in May and mid-June 2008, Plaintiff did report right knee pain, but at a visit in early

June 2008, she failed to do so (tr. 436–37). Nevertheless, Dr. Zawahry's treatment regimen remained the same, including the dosage of Lortab he prescribed (*see, e.g.*, tr. 436–39).

In July 2008, Plaintiff began treatment with Abdel-Azim Bayoumy, M.D., an internist (*see* tr. 495–96). Plaintiff complained of knee pain, although an examination of her extremities apparently was within normal limits (*see* tr. 496 (partially illegible treatment record)). Dr. Bayoumy continued Plaintiff's Lortab at the same level (*see* tr. 495).

In or about October 2008, Dr. Bayoumy referred Plaintiff to Mustafa A. Hammad, M.D., a physician with The NeuroPain Center (tr. 492). Dr. Hammad reviewed a MRI of the right knee (presumably the MRI from October 2007, as there is no evidence of another MRI obtained during the relevant period) and then assessed knee pain, osteoarthritis of the knee, and causalgia of the right lower extremity, as well as lower back pain/lumbago, and muscle spasms (*id.*). He also continued Plaintiff's Lortab (at 10 mg), with a maximum of three tablets per day, and advised Plaintiff to return in a few weeks for follow up (*id.*).

Plaintiff returned to Dr. Bayoumy in November 2008 (tr. 490). She reported right knee pain, and Dr. Bayoumy noted decreased ROM and tenderness in the knee, but it appears that a physical examination was otherwise unremarkable (*see id.*, another partially illegible treatment record; *see also* tr. 489). Dr. Bayoumy renewed Plaintiff's Lortab and advised her to return in four weeks (tr. 490–91). It appears that Dr. Bayoumy did not see Plaintiff in January, March, April, or early to mid-May of 2009, but he prescribed Lortab for Plaintiff at those times (*see* tr. 485–88). Plaintiff returned to Dr. Bayoumy in late May 2009 (tr. 482–83). She reported that her knee pain had worsened over the past four days (tr. 482). Dr. Bayoumy apparently noted decreased ROM in the knee, but otherwise a physical examination appears to have been normal, and Plaintiff's gait was normal (*see id.*). Dr. Bayoumy assessed, in relevant part, knee pain and lower back pain, and he advised Plaintiff to return in four to six weeks (*id.*). Plaintiff returned to Dr. Bayoumy on five additional occasions in 2009 (once in July, August, and November, and twice in December) (*see* tr. 511–20). On these occasions Plaintiff reported a variety of complaints, and Dr. Bayoumy diagnosed a variety of conditions, including anxiety, asthma, tobacco abuse, insomnia, left shoulder pain, and right knee pain (*see, e.g.*, tr. 511, 515, 517, 519). Examinations of the knee often revealed pain, reduced ROM, or swelling in the knee, but a normal gait and, from a neurologic standpoint, normal motor skills and symmetric

reflexes (*see, e.g.*, tr. 511, 517).[12]  Dr. Bayoumy's treatment regimen remained the same, that is, he continued to prescribe Lortab (*see, e.g.*, tr. 524–26).

In February 2010, Dr. Bayoumy referred Plaintiff for physical therapy ("PT"), to target her right knee arthritis and lower back pain (*see* tr. 528).  Plaintiff presented for an initial PT evaluation on March 4, 2010 (tr. 529).  The therapist scheduled Plaintiff for a total of sixteen PT sessions over the course of eight weeks (she was to attend two sessions per week) and set short and long-term goals, to be accomplished by Plaintiff within four weeks and eight weeks, respectively (*id.*).  The therapist also discussed a proposed treatment plan with Plaintiff, which included therapeutic exercises, manual therapy, ultrasound therapy, electric stimulation, and infrared therapy (*id.*).  Plaintiff agreed with the short and long-term goals, as well as the treatment plan, and she consented to the treatment (*id.*).  Plaintiff did not return for any PT sessions (and no session was conducted on the day of her initial evaluation) (*see* tr. 63).[13]

Finally, on April 14, 2010, five days after Plaintiff's hearing, she presented to Joellen Flory, ARNP-C, with a variety of complaints, including pain in the low back, left hip, and right knee (tr. 534).  ARNP Flory referred Plaintiff for x-rays of the lumbar spine (tr. 535), which were obtained on April 22, 2010, and revealed no abnormalities (tr. 539).  At a follow-up visit in late April, ARNP Flory recommended that Plaintiff's medications be continued (i.e., Lortab and Klonopin) and that Plaintiff obtain a MRI of the lumbar spine (tr. 532).  In May 2010, Plaintiff contacted ARNP Flory's office and advised that her pain medications were working (*see* tr. 533).  Plaintiff returned to ARNP Flory on May 13, 2010, and June 7, 2010, and the treatment notes are essentially the same as before (*see* tr. 530–31).

C.      Opinion of Non-Examining Agency Physician

---

[12] An examination by Dr. Bayoumy in November 2009 revealed no neurologic abnormalities, no musculoskeletal abnormalities, and no abnormalities in the extremities (*see* tr. 515–16).

[13] The ALJ questioned Plaintiff about the PT at her hearing.  In response to his questions, Plaintiff testified that she did not return for PT because "[t]he doctors did not believe there was anything they could do for [her] as far as rehab" (tr. 63).  Plaintiff further testified that at her initial PT evaluation (on March 4, 2010), she was advised that "about the only thing [the physical therapist told her was that she] could come back for some little massaging and stuff on [her] lower back," so she did not return (*id.*).  She also testified that her back pain improved and thus the PT was not really necessary (*see* tr. 63–64).  Upon questioning by her counsel, Plaintiff elaborated on the PT issue, stating "[I was] basically just told [that] there was no rehab or rehabilitation . . . that they could do for me" (tr. 67).

On August 4, 2008, state agency expert Donald Morford, M.D., completed a RFC assessment form and generally opined that Plaintiff was capable of performing sedentary work during the relevant period (*see* tr. 471–78). More specifically, Dr. Morford opined that in an eight-hour workday Plaintiff could frequently lift or carry ten pounds, stand or walk at least two hours, and sit about six hours (tr. 472). She was limited in pushing or pulling with the lower extremities (tr. 472) and could never climb ladders, ropes, or scaffolds but could occasionally stoop, kneel, crouch, crawl, balance, and climb ramps or stairs (tr. 473).

D.      Testimony of the Vocational Expert

A vocational expert ("VE") testified at Plaintiff's hearing. In summary, the VE testified that a hypothetical person with Plaintiff's RFC could have performed available work during the relevant period, including work as a telephone marketer or solicitor, silver wrapper, and maintenance clerk, all of which were performed at the sedentary level of exertion and would have otherwise accommodated Plaintiff's RFC (tr. 68–69). If the hypothetical person had to sit with her leg elevated, however, all jobs would have been eliminated (tr. 69).

V.      DISCUSSION

Plaintiff raises two issues in this appeal. She contends the ALJ erred: (1) in concluding that her DJD of the right knee did not meet the requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02(A) (hereafter "Listing 1.02"); and (2) by rejecting her subjective complaints of pain and other symptoms based on her failure to obtain medical treatment (doc. 16 at 6).

A.      Listing 1.02

The relevant provisions of Listing 1.02 provide as follows:

1.02  *Major dysfunction of a joint(s) (due to any cause)*:  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
      A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt. 404, Subt. P, app. 1, Listing 1.02(A).

Section 1.00(B) contains two subsections that define or otherwise explain an inability to ambulate effectively, §§ 1.00(B)(2)(b)(1) and (2).

The first subsection states:

(1) *Definition.* Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J [discussing orthotic devices, prosthetic devices, and hand-held assistive devices]) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .

20 C.F.R. pt. 404, Subt. P, app. 1, § 1.00(B)(2)(b)(1).

The second subsection states:

(2) *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.*, § 1.00(B)(2)(b)(2).

In order for Plaintiff to show that her DJD matches Listing 1.02(A), she must meet all of the specified medical criteria. Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). Further, it is her burden to present evidence that her impairment meets or equals the listing. 20 C.F.R. § 416.926; Zebley, 493 U.S. at 531. Additionally, "While [the listings] must be considered in making a disability determination, it is not required that the [Commissioner] mechanically recite the evidence leading to her determination. There may be an implied finding that a claimant does not meet a listing." Hutchison v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986) (citing Edwards v. Heckler, 736 F.2d 625, 629 (11th Cir. 1984)).

Here, the ALJ summarized the relevant medical evidence of record and then concluded that Plaintiff's DJD does not meet the requirements of Listing 1.02(A) (*see* tr. 26–31). The ALJ did not err in so concluding. Initially, Plaintiff provided no evidence of a knee impairment which may be considered a "gross anatomical deformity," as required by the introductory paragraph of Listing

1.02(A).[14] *See, e.g.*, Forest v. Astrue, No. CIV.A. 11-2017, 2012 WL 3137844, at *12 (E.D. La. Aug. 1, 2012), *report and recommendation adopted*, CIV.A. 11-2017, 2012 WL 3437514 (E.D. La. Aug. 15, 2012) ("The medical records contain evidence of decreased range of motion in plaintiff's right knee, but no medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of that knee. Therefore, he does not meet the [] requirement of Listing 1.02 in his right knee.").

Additionally, even if Plaintiff had satisfied the requirements of the introductory paragraph of Listing 1.02(A), she has not—and cannot—establish the criteria of the remainder of the listing (i.e., an inability to ambulate effectively). First, with regard to subsection 1.00(B)(2)(b)(1), there is no evidence establishing that Plaintiff needed a hand-held assistive device to ambulate during the relevant period, much less such a device that limited the functioning of both upper extremities. Plaintiff admitted as much during her hearing (*see* tr. 64), and she reported as much on a disability report dated August 30, 2008 (tr. 245, specifically reporting that did not use crutches, a walker, or a cane). *Cf.* Bullock v. Astrue, 277 F. App'x 325, 328 (5th Cir. 2007) (criteria of Listing 1.02 not met, where (among other factors) claimant used a "single cane"—not a walker, two crutches, or two canes—and retained the ability to climb stairs with the use of a handrail); Prince v. Colvin, No. 5:12-CV-751-LSC, 2013 WL 754859, at *5 (N.D. Ala. Feb. 27, 2013) (ALJ was not required to accept plaintiff's testimony that he used a cane; and, in any event, where record contained no indication that plaintiff was ever prescribed a hand-held assistive device or that its use limited the functioning of both of his arms, plaintiff was not "extremely limited in his ability to walk") (citing § 1.00(B)(2)(b)(1)). Second, with respect to subsection 1.00(B)(2)(b)(2), substantial evidence supports the ALJ's conclusion that Plaintiff retained the ability to ambulate effectively. For example, Plaintiff clearly was able to perform a variety of activities of daily living during the relevant period. As the

---

[14] As discussed *supra*, Dr. Zawahry noted an "extensive deformity of [Plaintiff's] right knee" when he consultatively examined her on October 15, 2007. Evidently, however, Dr. Zawahry was referring to the external appearance of Plaintiff's knee and skin (which were scarred from the electrical burn and/or multiple surgeries and skin grafts), because he did not review the results of any diagnostic tests, such as x-rays or MRIs, prior to examining Plaintiff. Moreover, the physicians that actually reviewed Plaintiff's MRI results did not thereafter diagnose a "gross anatomical deformity," such as subluxation or ankylosis, but rather assessed degenerative arthritic changes, an irregular medial meniscus, degenerative changes in the lateral meniscus, and chondromalacia patella (Dr. Gaiser); and knee pain, osteoarthritis of the knee, and causalgia of the right lower extremity (Dr. Hammad). Accordingly, Plaintiff has not satisfied the requirements of the introductory paragraph of Listing 1.02(A) (requiring, in part, a gross anatomical deformity and findings on appropriate medically acceptable imaging).

ALJ noted, Plaintiff testified she could drive a couple of times a week (and drove to her hearing), dress herself, make beds, take a bath, shower, care for her mother, prepare meals in a microwave, load the dishwasher, wipe the counter, dust, fold laundry, and go to the beach, swim, or sit by the pool (tr. 27). The ALJ also noted similar reports by Plaintiff's mother regarding Plaintiff's abilities, including reports that Plaintiff could prepare meals, handle her personal care, do housework, do laundry, and shop (tr. 29). The ALJ also pointed to Plaintiff's ability to walk without a walker, two crutches, or a cane—a factor relevant to both subsections 1.00(B)(2)(b)(1) and (2)—as well as the lack of observations or opinions by Plaintiff's physicians that she used or needed an assistive device to ambulate (*see* tr. 28). Continuing, the ALJ noted that Plaintiff—who lived on the second floor of her building—testified that she could take the stairs if necessary and did so on occasion (tr. 27). The record also shows that Plaintiff could carry out "routine ambulatory activities," such as shopping or banking. On these facts, it is clear that Plaintiff failed to carry her burden of establishing an inability to ambulate effectively, as defined in the regulations. *See* Bullock, 277 F. App'x at 328; §§ 1.00(B)(2)(b)(1), (2).

In conclusion, while it is clear that Plaintiff's DJD of the right knee caused some pain and limitations during the relevant period, in light of the deferential standard of review applicable here and the undersigned's careful review of the record, the undersigned easily concludes that substantial evidence supports the ALJ's finding that Plaintiff's DJD did not meet the requirements of Listing 1.02(A). Most notably, Plaintiff was not diagnosed with a gross anatomical deformity as required by the introductory paragraph of the listing. Further, even if she met the requirements of the introductory paragraph, she would also have to show that she is unable to ambulate effectively as described in section 1.00(B)(2)(b), but she failed to do so. Thus, Plaintiff is not entitled to relief on this claim.

B.      ALJ's Credibility Findings

Plaintiff contends the ALJ erred in discounting her complaints of disabling pain and limitations based on her failure to obtain regular and ongoing treatment, "without first considering any evidence which may explain the lack of treatment" (doc. 16 at 11–12) (citing Social Security Regulation 96-7p). Plaintiff then argues that to the extent she failed to obtain regular treatment, she failed to do so because she could not afford such treatment (doc. 16 at 12–13) (citing, among other cases, Dawkins v. Bowen, 848 F.2d 1211, 1212 (11th Cir. 1988) ("a claimant's inability to afford a prescribed medical treatment

excuses noncompliance")). In support of her argument Plaintiff points to notations made by Dr. Zawahry on October 16, 2007, reflecting Plaintiff's statements that she "[had no] insurance at the present time" but would obtain a repeat MRI of the lower back when she was insured (doc. 16 at 13). Additionally, Plaintiff suggests the ALJ should have inquired about her lack of treatment during her hearing and explained in his decision "any factors which may have contributed to [Plaintiff's] lack of treatment or noncompliance" (doc. 16 at 13–14).

In Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991), the court articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through her own testimony of pain or other subjective symptoms. The pain standard requires: (1) evidence of an underlying medical condition and either (a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt, 921 F.2d at 1223 (internal citation omitted). If a claimant testifies as to her subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the allegations of completely disabling symptoms. Foote, 67 F.3d at 1561–62. Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'" Id. at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). The credibility determination does not need to cite "'particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the court] to conclude that [the ALJ] considered her medical condition as a whole.'" Id. (quoting Jamison v. Bowen, 814 F.2d 585, 588–90 (11th Cir. 1987)).

Here, the ALJ first identified the correct pain standard (see tr. 26). He then articulated numerous reasons for discounting Plaintiff's allegations, including that: (1) Plaintiff's daily activities are inconsistent with her allegations of disabling pain and limitations; (2) treatment records do not substantiate Plaintiff's subjective complaints, including records that reflect the results of physical examinations and/or improvement in Plaintiff's condition; (3) no physician (other than Dr. Zawahry, whose opinions the ALJ rejected) stated that Plaintiff needed to elevate her leg the majority of the day[15]; (4) Plaintiff's allegations are inconsistent with the opinions of Dr. Morford, who opined that

---

[15] Plaintiff does not contend the ALJ erred in rejecting Dr. Zawahry's opinions, and the court finds no error in this regard.

Plaintiff could perform sedentary work; (5) Plaintiff sought no treatment from an orthopedic specialist after December 2007; and (6) "there have been significant gaps in treatment," including for the period between 2004 and 2007 when Plaintiff sought no treatment (tr. 27–31).

The ALJ did not err with respect to the foregoing credibility findings. Initially, even if the ALJ erred in considering Plaintiff's lack of ongoing and regular treatment, the error would be harmless. The other reasons cited by the ALJ are well supported by the record—to be sure, Plaintiff does not contend otherwise—and the ALJ's other reasons, standing alone, substantially support his overall credibility findings. *See, e.g.,* Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (the ALJ's decision will stand when an incorrect application of the regulations results in "harmless error," because the correct application would not contradict the ALJ's ultimate findings); Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (reversal and remand based on disregard of a social security ruling may occur only when the plaintiff also shows that prejudice arose from that error); *cf.* Dawkins, 848 F.2d at 1212 ("In denying appellant SSI disability benefits, the ALJ relied primarily if not exclusively on evidence in the record and testimony at the hearing concerning appellant's noncompliance with prescribed medical treatment.").

The ALJ, however, did not err in considering Plaintiff's lack of ongoing treatment. Although Plaintiff advised Dr. Zawahry (in October 2007) that she did not have insurance but would schedule a lumbar MRI when she obtained insurance, nothing in the record explains why Plaintiff failed to obtain treatment for her knee condition between 2004 and October 2007, which is the condition that primarily—if not exclusively—underlies the claims raised in this appeal, or why Plaintiff failed to obtain treatment for her knee from a specialist after December 2007.[16]  Additionally, Plaintiff has pointed this court to nothing in the record indicating that she was denied treatment due to an inability

---

[16] The relevant period in this case began on July 12, 2007, but Plaintiff's failure to seek any treatment between 2004 and 2007 is nevertheless pertinent because Plaintiff alleges she became disabled in 1979.  What is more, the first treatment record from the relevant period (i.e., from Southern Orthopedics, dated October 12, 2007) indicates that Plaintiff presented due to an abrupt onset of knee pain, which suggests that her condition was stable for an extended period of time.  What is more, Southern Orthopedics' records reveal that the "abrupt onset" of pain was due to an infection in Plaintiff's knee, which sufficiently cleared by December 5, 2007, after which Plaintiff never returned (and it is clear that she could have done so, as the December 2007 treatment record states that Plaintiff should return on an "as needed" basis).  Instead, she subsequently received treatment from internists, not orthopedic specialists (as the ALJ noted (*see* tr. 30–31)).

to pay for it (or to pay for a MRI), and the court has found no such indication.[17]  On the contrary, most—if not all—of the treatment records conclude with a notation that Plaintiff should return for follow up at a specified interval or "as needed."  Finally, and quite tellingly, the PT records—when considered alongside Plaintiff's testimony—demonstrate that Plaintiff failed to follow Dr. Bayoumy's recommended course of treatment for reasons that were wholly unrelated to her financial circumstances.  As previously noted, Dr. Bayoumy referred Plaintiff for PT, and she presented for an initial evaluation but never returned.  She testified that she did not return because she was told that the only thing that could be done was a "little massaging and stuff on [her] lower back," because she no longer had back pain so the PT was not necessary, and/or because she was told "there was no . . . rehabilitation . . . they could do for [her]" (tr. 63–64, 67).  Thus, her failure to participate in PT cannot in any way be attributed to a lack of financial resources.[18]

Finally, to the extent Plaintiff faults the ALJ for failing to inquire about her financial situation during her hearing or to further consider this issue, the undersigned notes that Plaintiff was represented by counsel at her hearing, the ALJ allowed counsel to question Plaintiff, and counsel failed to elicit any testimony from Plaintiff that might substantiate (or alert the ALJ to) the claim of poverty she now raises (*see* tr. 34, 64–67).  Likewise, the ALJ allowed counsel to make opening and closing statements at Plaintiff's hearing, and counsel did so, but he made no statement that would have alerted the ALJ to the issue (*see* tr. 40, 70).  Although ALJs have a duty to fully and fairly develop the record, Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003), a claimant nevertheless is also obligated, in some reasonable fashion, to raise the issue sought to be developed.  Wall v. Astrue, 561 F.3d 1048, 1062–63 (10th Cir. 2009) (ALJ has a duty to develop the record consistent with the issues raised).  In the instant case, Plaintiff did not testify that she could not afford treatment (and thus failed to obtain it), and her attorney did not bring any such issue to the attention of the ALJ.

VI.    CONCLUSION

---

[17] Even though Plaintiff could not afford a lumbar MRI, she still received treatment for her back pain.

[18] As an aside, Plaintiff's overall credibility is undermined by the fact that her testimony (regarding the nature of the PT offered to her and why she failed to obtain it) is contradicted by the record.  It is clear from the report of her initial PT evaluation that the therapist designed a sixteen-session course of PT, involving various treatment modalities in addition to massage therapy, and that Plaintiff agreed and consented to this course of treatment.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is **ORDERED** that:

1.      Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this case.

2.      The decision of the Commissioner is **AFFIRMED**, that this action is **DISMISSED,** and that the clerk is directed to close the file.

At Pensacola, Florida this 31st day of January 2014.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**